## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHRISTINE SANCHEZ, both individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | |
| HEALTH CARE SERVICES CORPORATION; BLUE CROSS AND BLUE SHIELD OF ILLINOIS; BLUE CROSS AND BLUE SHIELD OF TEXAS; BLUE CROSS AND BLUE SHIELD OF NEW MEXICO; BLUE CROSS AND BLUE SHIELD OF OKLAHOMA; BLUE CROSS AND BLUE SHIELD OF MONTANA; TMG HEALTH INC.; and DOES 1-10, | JURY TRIAL DEMANDED |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff, Christine Sanchez, ("Plaintiff") both individually and on behalf of all others similarly situated as identified below ("Class Members"), brings this action against Defendants, Health Care Services Corporation; Blue Cross and Blue Shield of Illinois; Blue Cross and Blue Shield of Texas; Blue Cross and Blue Shield of New Mexico; Blue Cross and Blue Shield of Oklahoma; Blue Cross and Blue Shield of Montana, Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana Inc.; TMG Health, Inc.; and DOES 1-10 (collectively, "Defendants"), by and through her attorneys, and allege, based upon personal knowledge as to Plaintiff's own actions, and based upon information and belief as to all other allegations, which will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, as follows:

## I.   INTRODUCTION

1.     Defendants are Illinois-based Health Care Services Corporation ("HCSC"), Blue Cross and Blue Shield of Illinois ("BCBSIL"), a primary provider of health care services based in Illinois that works in concert with HCSC (which in turn contracts with the Centers for Medicare and Medicaid Services (CMS) to provide services for Medicare Advantage enrollees within BCBSIL and nationwide), Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, Blue Cross and Blue Shield of Montana, and Caring for Montanans, Inc. f/k/a Blue Cross and Blue Shield of Montana Inc., all of which are affiliated with HCSC and were the subject of the same data breach incident, and a third party vendor or contractor (TMG Health Inc., referred to herein as "TMG") that contracts with HCSC and/or these other entities to provide third party administrative services to them.

2.     In the course of providing services to Plaintiff and Class Members, Defendants collected, maintained, and stored highly sensitive personal and medical information pertaining to patients, including, but not limited to Social Security numbers, dates of birth, full names, email addresses, and telephone numbers ("personally identifying information" or "PII"); information associated with such individuals' medical service information, which could include treatment, diagnosis, and prescriptions, medical record and account claim numbers, health insurance information, beneficiary information and other protected health information ("protected health information" or "PHI"); and financial bank account information ("financial account information") (collectively "Private Information").

3.     On or about September 5, 2023, BCBSIL began sending letters to many of its members with past or current health insurance coverage with BCBSIL. In this notice it informed the public that on June 23, 2023, it had become aware that these members' PHI and Private

Information had been accessed by an unauthorized party on June 21, 2023 at a vendor of TMG and "that due to the unauthorized access by a bad actor, your information may have been disclosed to the wrong individual.[1]" Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, Blue Cross and Blue Shield of Montana, and Caring for Montanans, Inc. f/k/a Blue Cross and Blue Shield of Montana Inc., also began sending similar notices to their members about the same time that apparently arise out of the same data breach incident. Collectively, these data breaches are referenced herein as the "Data Breach".

4.     Plaintiff and members of the Class are members of Blue Cross Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, Blue Cross and Blue Shield of Montana and/or Caring for Montanans, Inc. f/k/a Blue Cross and Blue Shield of Montana Inc., whose Private Information was compromised by the Data Breach and who just recently received notice of the Data Breach.

5.     Defendants failed to invest in adequate data security, and as a direct, proximate, and foreseeable result of their inexcusable failure to implement reasonable security protections sufficient to prevent an eminently avoidable cyberattack, unauthorized actors accessed their customers' files containing highly-sensitive PHI and Private Information.

6.     Defendants' failure to expeditiously notify Plaintiff and Class Members that their Private Information was exfiltrated months earlier virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse and/or disseminate that Private Information before Plaintiff and Class Members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class Members have had their Private Information

---

[1] See, e.g., Notice of Cognizant / TMG Data Incident (https://www.bcbsil.com/company-info/stay-informed/alerts-announcements/9-5-23-tmg-data-incident (last accessed October 31, 2023).

compromised and have suffered injury in fact and economic losses, and will continue to suffer from the substantial and concrete risk that their identities have been stolen and misappropriated.

7.     By virtue of the Data Breach and the fact it took place, it is clear that Defendants failed to take sufficient and reasonable measures to safeguard data security systems over which they had direct and/or oversight responsibility to protect highly sensitive data in order to prevent the Data Breach from occurring; to timely disclose to their members, and the public at large, that they lacked appropriate data systems and security practices to secure Private Information; and to timely detect and provide adequate notice of the Data Breach to affected individuals.

8.     As a result of Defendants' negligent, reckless, intentional, and/or unconscionable failure to adequately satisfy their contractual, statutory, and common-law obligations, Plaintiff's and Class Members' Private Information was accessed and acquired by unauthorized third parties for the express purpose of misusing the data and causing further irreparable harm to their personal, financial, and medical well-being. Plaintiff and Class Members face the real, immediate, and likely danger of identity theft and misuse of their Private Information, especially because their Private Information was specifically targeted by malevolent actors.

9.     Plaintiff and Class Members suffered injuries as a result of Defendants' conduct including, but not limited to lost or diminished value of their Private Information; out-of-pocket expenses attributable to the Data Breach and/or associated with the prevention, detection, and recovery from identity theft and the unauthorized use of their Private Information; lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; time needed to change usernames and passwords on their accounts; time needed to investigate, correct and resolve unauthorized access to their accounts; time needed to

deal with spam messages and e-mails received subsequent to the Data Breach; charges and fees associated with fraudulent charges on their accounts; and the continued and increased risk of compromise to their Private Information, which is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect their Private Information. Now that this data has been leaked and exfiltrated, these risks will remain for the lifetimes of Plaintiff and the Class Members.

10.     Accordingly, Plaintiff brings this action on behalf of all those similarly situated to seek relief from Defendants' failure to reasonably safeguard Plaintiff's and Class members' Private Information; their failure to reasonably provide timely notification that Plaintiff's and Class Members' Private Information had been compromised by an unauthorized third party; and for deceiving Plaintiff and Class Members concerning the status, safety, location, access, and protection of their Private Information.

## II.     **PARTIES**

11.     On personal knowledge, Plaintiff Christine Sanchez is a resident of Chicago, Illinois. Plaintiff's Private Information was among that compromised by the Data Breach as she received notice of the Data Breach on or about September 7, 2023, from BCBSIL. The breach occurred on June 23, 2023, according to the letter. She was told she would get a free credit bureau report but now is being denied that report for free. Since the Data Breach took place in June 2023 but she did not receive notices for months, she has suffered economic injuries as she has been subject to identity theft, has had passwords changed to certain accounts without her consent, and has had fraudulent charges made to financial accounts for computer gaming and charges on Amazon, and was even notified that a loan application for a house was denied that she did not make. She also received a fraudulent $4,000 check and increased spam texts and targeted

marketing. She also had viruses uploaded to her phone without her consent that made her phone inoperable to such a degree that she was forced to expend money to obtain a new phone and lost all her stored pictures and contacts because she could not access them. She has had to expend over 20 hours of personal time attempting to address these issues, without compensation, valuable time that otherwise would have spent on other activities and/or resulted in lost wages.

12.     As a result of the Data Breach, Plaintiff has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff's Private Information has been obtained by unauthorized third parties that caused Plaintiff to experience identity theft and fraud, including an attempted fraudulent charge after the Data Breach occurred, increased spam messages and targeted marketing since the Data Breach. Additionally, the risk of future identity theft and fraud is evident from Defendants' own statements, offering Plaintiff and Class Members free enrollment in a credit-monitoring service, allegedly to protect them against losses attributable to identity theft. Plaintiff and Class Members thus face imminent, certainly impending, or a substantial risk of harm due to the Data Breach, particularly as Plaintiff and others have already experienced fraudulent charges and spam messaging. Plaintiff thus has standing to assert the claims at issue herein.

13.     As a result of the Data Breach, Plaintiff has also suffered anxiety due to the public dissemination of her Private Information, which she reasonably believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using her Private Information for purposes of identity theft and fraud. Plaintiff is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

6

14.     Plaintiff also has suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendants obtained from Plaintiff; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

15.     As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is also at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

16.     Defendant, Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, is an Illinois corporation with its corporate headquarters located at 300 East Randolph Street, Chicago, IL 60601-5099.  Health Care Service Corporation operates and does business as Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, Blue Cross and Blue Shield of Texas, and Blue Cross and Blue Shield of Montana.  With more than 15 million enrollees, HCSC is the largest customer-owned mutual health insurance company in the country and the fourth largest health insurance company overall. Health Care Service Corporation, its subsidiaries and health care plans are collectively referred to as "HCSC" in this Complaint.

17.     Defendant, Blue Cross and Blue Shield of Illinois, is a division of Defendant HCSC with its principal place of business located at 300 East Randolph Street, Chicago, Illinois 60601. It is the parent of a number of subsidiaries that provide health care financing to over 7 million enrollees in various health care plans in Illinois.  Blue Cross and Blue Shield of Illinois, its

subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Illinois" or "BCBSIL" in this Complaint.

18.     Defendant, Blue Cross and Blue Shield of Texas, is a division of Defendant HCSC with its principal place of business located at 1001 E. Lookout Drive, Richardson, Texas 75082. Blue Cross and Blue Shield of Texas is the parent of a number of subsidiaries that provide health care financing to 4.7 million enrollees in various health care plans in Texas. Blue Cross and Blue Shield of Texas, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Texas" or "BCBSTX" in this Complaint.

19.     Defendant, Blue Cross and Blue Shield of New Mexico, is a division of Defendant HCSC with its principal place of business located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, New Mexico 87113. Blue Cross and Blue Shield of New Mexico is the parent of a number of subsidiaries that provide health care financing to 550,000 enrollees in various health care plans in New Mexico. Blue Cross and Blue Shield of New Mexico, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of New Mexico" or "BCBSNM" in this Complaint.

20.     Defendant, Blue Cross and Blue Shield of Oklahoma, is a division of Defendant HCSC with its principal place of business located at 1400 South Boston, Tulsa, Oklahoma 74119. Blue Cross and Blue Shield of Oklahoma is the parent of a number of subsidiaries that provide health care financing to more than 835,000 enrollees in various health care plans in Oklahoma. Blue Cross and Blue Shield of Oklahoma, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Oklahoma" or "BCBSOK" in this Complaint.

21.     Defendant, Blue Cross and Blue Shield of Montana, is a division of Defendant HCSC with its principal place of business at 3645 Alice Street, Helena, Montana 59604-4309. It

is the parent of a number of subsidiaries that provide health care financing to approximately 240,000 enrollees in various health care plans in Montana. Blue Cross and Blue Shield of Montana, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Montana" or "BCBSMT" in this Complaint. Caring for Montanans, Inc. f/k/a Blue Cross and Blue Shield of Montana Inc. is a Montana corporation with its corporate headquarters located at 3645 Alice Street, Helena, Montana 59604-4309. When Blue Cross and Blue Shield of Montana, Inc. was sold to Defendant HCSC, certain of its liabilities including certain liabilities relating to litigation, remained with the corporation now known as Caring for Montanans, Inc. For purposes of this Complaint, references to Blue Cross and Blue Shield of Montana are deemed to include Caring for Montanans, Inc. and Blue Cross and Blue Shield of Montana, Inc.

22.     Defendant, TMG Health, Inc., is the leading national provider of Business Process Outsource solutions for Medicare Advantage, Part D and Managed Medicaid plans and provides third party administration services to the other named Defendants. Its principal place of business is located at 100 Four Falls Corporate Center, Suite 406, Conshohocken, Pennsylvania 19428. TMG Health was once owned by Defendant, HCSC, and was sold to Cognizant in 2017. TMG Health, its parent, subsidiaries and affiliated entities are collectively referred to as "TMG" in this Complaint.

23.     The true names, roles and/or capacities of Defendants named as DOES 1 through 10, inclusive, are currently unknown to Plaintiff and, therefore, are named as Defendants under fictitious names as permitted by the rules of this Court. Plaintiff will identify their true identity and their involvement in the wrongdoing at issue, if and when they become known.

24.     Defendants' conduct described herein was undertaken or authorized by Defendants' officers or managing agents who were responsible for supervision and operations

decisions relating to the systems, practices and procedures at issue. The described conduct of said managing agents and individuals was undertaken on behalf of Defendants. Defendants had advance knowledge of the actions and conduct of said individuals whose actions and conduct were ratified, authorized, and approved by such managing agents. Defendants conspired and aided and abetted each other in violating the laws set forth herein, which conduct is on-going.

### III.    JURISDICTION AND VENUE

25.    This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and at least one Class member is a citizen of a state different from Defendants. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

26.    This Court has personal jurisdiction over Defendants because Defendants are either headquartered in Illinois, performed services for companies based in Illinois or are affiliated with or subsidiaries of companies based in Illinois.

27.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's and Class Members' claims occurred in this District.

### IV.    FACTUAL ALLEGATIONS

A.    **The BCBSIL Data Breach**

28.    On or about August 14, 2023, TMG and HCSC filed a notice with the Attorney General of Maine describing a third-party data breach. In this notice, Defendants disclosed that the incident resulted in an unauthorized party being able to access consumers' sensitive information

and that this incident impacted hundreds of thousands of BCBSIL members. Despite the sensitivity of the data in question, Defendants did not begin mailing notices to Class Members until at least three weeks later.

29.     On or about September 5, 2023, BCBSIL began mailing letters to members with past or current health insurance coverage with BCBSIL, informing members of "a recent incident" involving their Private Information. In light of Defendants' description of the compromised information, it appears the Data Breach included Plaintiff's and Class Members' benefit enrollment information and beneficiary information, which could contain private facts about Plaintiff and Class Members such as their financial history, medical history, and beneficiary information, and thus would constitute PHI.

30.     According to that letter, on June 23, 2023 "we became aware that your PHI was accessed by an unauthorized party on 06/21/2023 at a vendor of TMG Health (TMG). TMG provides third party administrative services to Medicare enrollees of HCSC Insurance Services Company (HISC). HISC is contracted with the Centers for Medicare and Medicaid Services (CMS) to offer this product." While not saying it was taking any specific action, BCBSIL asserted that "In order to minimize any harm, TMG is working closely with the vendor to ensure systems are updated to block these activities and prevent disclosures of this nature from occurring in the future. TMG is committed to maintaining the privacy and security of your information and is taking this incident very seriously. Our vendor has notified law enforcement to mitigate this situation as best as possible."

31.     BCBSIL in that letter claimed that it "takes the confidentiality of members' data very seriously. We have no reason to believe that anyone has accessed or misused your information. However, we want to make you aware of steps you may take to guard against identity

theft or fraud. If you receive or access explanation of benefits statements (EOBs) from BCBSIL, we recommend that you regularly review these statements. If you see any service that you did not receive, please call us at the number found on the statement or on the back of your member identification (ID) card. If you do not receive or access EOBs, contact your provider or plan and request that they send you a statement following the provision of any services under your name and ID number." Despite these assertions, Defendants' system permitted this Data Breach to take place and failed to send out notice for months, and in fact many people, including Plaintiff, had their sensitive data misused.

32.     Defendants have offered no compensation to consumers.  Instead, according to the Data Breach notice, "To protect you from potential identity theft, we are offering you one year of complimentary Personal Identity and Privacy Protection through a national leader in data breach response services, IDX A ZeroFox Company, the data breach and recovery services expert. IDX identity protection services include: 12 months of credit and CyberScan monitoring, a $1,000,000 insurance reimbursement policy, and fully managed ID theft recovery services. With this protection, IDX will help you resolve issues if your identity is compromised."  This is a wholly inadequate offer, as much of this data can be used for years – and may in fact be inventories for more than a year.

33.     This was a significant data breach. According to information submitted by Defendants to the Maine Attorney General, this aspect of the Data Breach may have impacted as many as 192,231 individuals who were present or former members of BCBSIL, and likely tens if not hundreds of thousands of additional individuals as set forth below.

**B.      The Other Related Data Breaches**

34.      The data breach involving BCBSIL was not isolated, but just one in a series of breaches involving Defendants that were all related to the same or similar actions or inactions of HCSC and TMG.

35.      On or about September 5, 2023, BCBSNM announced that it had begun mailing letters to members with past or current health insurance coverage with BCBSNM, informing their members of "a recent incident" involving their Private Information that took place on June 21, 2023, and that they learned about on or about June 23, 2023.

36.      On or about September 5, 2023, BCBSTX announced that it had begun mailing letters to members with past or current health insurance coverage with BCBSTX, informing members of "a recent incident" involving their Private Information that took place on June 21, 2023, and that they learned about on or about June 23, 2023.

37.      On or about September 5, 2023, BCBSOK announced that it had begun mailing letters to members with past or current health insurance coverage with BCBSOK, informing members of "a recent incident" involving their Private Information that took place on June 21, 2023, and that they learned about on or about June 23, 2023.

38.      On or about September 5, 2023, BCBSMT announced that it had begun mailing letters to members with past or current health insurance coverage with BCBSMT, informing members of "a recent incident" involving their Private Information that took place on June 21, 2023, and that they learned about on or about June 23, 2023.

39.      All of these incidents appeared to be tied to the same unauthorized access event and thus appear to be part of the same data breach. The website announcements for each of these companies all connect to the same common notice (even though that notice only refers to BCBS

IL), they all involve the same time periods, they all offer the same inadequate relief, and all the notices are phrased in virtually the same way as the notice referenced in n.1 *supra.*

40.     At this time none of these entities have disclosed publicly how many of their members received notices of the Data Breach. However, based on the scope and extent of the BCBSIL data breach, it is likely that there are tens if not hundreds of thousands of additionally impacted individuals.

**C.     Defendants' Failures Both Prior to and Following the Data Breach**

41.     Defendants could have prevented this Data Breach by timely discovering such vulnerabilities and quickly patching them before they were exploited. Indeed, Defendants had months if not years to discover not only this vulnerability but also the fact that cybercriminals had attempted to exploit the same or similar breach before.  For example, back in 2015, one of BCBSIL's sister organizations, Premera Blue Cross, was the subject of a similar cyberattack but did not detect the attack for seven months. The attack involved similar types of information and implicated members who had BCBSIL coverage and used such services in Alaska and Washington. And on the same day as the announcement of the Data Breach (September 5, 2023), BCBSIL disclosed to certain BCBSIL members that on June 15, 2023 "we became aware that your PHI may have been inadvertently disclosed to an unauthorized party between September 19, 2022, and May 18, 2023."  BCBSIL learned of this second incident just six days before the Data Breach took place.

42.     When Defendants finally acknowledged that they had experienced the Data Breach, they failed to timely and expeditiously inform Plaintiff and Class Members that their information had been compromised, simply saying that such data might have been compromised.

43. Defendants have made little effort to protect Plaintiff and the Class Members from the long-term consequences of this Data Breach. While Defendants (or at least some of them) have offered complimentary credit monitoring and insurance services to Plaintiff and other Class Members, that is still insufficient to mitigate the heightened risk of identity theft that Plaintiff and the Class Members would suffer for the remainder of their lives.

44. Defendants' failures, including the failure to timely detect the Data Breach and to properly and timely notify Plaintiff and Class Members that their PHI and Private Information had been exfiltrated, allowed cyber criminals to access, misappropriate and misuse Plaintiff's and Class members' Private Information for months before Defendants finally afforded victims the opportunity to take steps to defend themselves and mitigate the near- and long-term consequences of the Data Breach.

**D. Data Breaches Pose Significant Threats**

45. Data breaches have become a constant threat. PHI and PII, including Social Security numbers, are a particularly valuable commodity and a frequent target of hackers. Personal information stolen in data breaches is sometimes compiled in "Fullz" packages that are then sold to parties that use the information for telemarketer operations or to commit fraud. Personal information stolen in data breaches is also used to cross-reference other available information used to further identity theft and fraud attempts.

46. In 2022, the Identity Theft Resource Center's Annual End-of-Year Data Breach Report listed 1,802 total compromises involving 422,143,312 victims for 2022, which was just 50 compromises short of the current record set in 2021.[2] The HIPAA Journal's 2022 Healthcare Data

---

[2] *2022 End of Year Data Breach Report*, Identity Theft Resource Center (January 25, 2023), available at: https://www.idtheftcenter.org/publication/2022-data-breach-

Breach Report reported 707 compromises involving healthcare data, which is just 8 shy of the record of 715 set in 2021 and still double that of the number of similar such compromises in 2017 and triple the number of compromises in 2012.[3]

47.   Statista, a German entity that collects and markets data relating to, among other things, data breach incidents and the consequences thereof, confirms that the number of data breaches has been steadily increasing since it began a survey of data compromises in 2005 with 157 compromises reported that year, to a peak of 1,862 in 2021, to 2022's total of 1,802.[4] The number of impacted individuals has also risen precipitously from approximately 318 million in 2015 to 422 million in 2022, which is an increase of nearly 50%.[5]

48.   Data breaches are a constant threat because PII is routinely traded on the dark web as s simple commodity, with Social Security numbers being so ubiquitous to be sold at as little as $2.99 apiece and passports retailing for as little as $15 apiece.[6]

49.   In addition, the severity of the consequences of a compromised Social Security number belies the ubiquity of stolen numbers on the dark web. Criminals and other unsavory elements can attempt to fraudulently take out loans under the victims' name (such as happened with Plaintiff), open new lines of credit, and cause other serious financial difficulties for victims:

> [a] dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your

---

report/?utm_source=press+release&utm_medium=web&utm_campaign=2022+Data+Breach+Report+ (last accessed March 23, 2023).

[3] *2022 Healthcare Data Breach Report*, The HIPAA Journal (January 24, 2023), available at: https://www.hipaajournal.com/2022-healthcare-data-breach-report/ (last accessed March 23, 2023).

[4] *Annual Number of Data Breaches and Exposed Records in the United States from 2005 to 2022*, Statista, available at: https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed/ (last accessed last accessed March 23, 2023).

[5] *Id.*

[6] *What is your identity worth on the dark web?* Cybernews (September 28, 2021), available at: https://cybernews.com/security/whats-your-identity-worth-on-dark-web/ (last accessed March 23, 2023).

> good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[7]

This is exacerbated by the fact that the problems arising from a compromised Social Security number are exceedingly difficult to resolve. A victim is forbidden from proactively changing his or her number unless and until it is misused, and the harm has already occurred. And even this delayed remedial action is unlikely to undo the damage already done to the victims:

> Keep in mind that a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.[8]

50.     Beyond Social Security numbers, the most sought after and expensive PII on the dark web are stolen medical records, such as at issue here, which command prices from $250 to $1,000 each.[9] Medical records are considered the most valuable because, unlike credit cards that can easily be canceled,  medical records contain "a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information".[10] With this bounty of ill-gotten information, cybercriminals

---

[7] United States Social Security Administration, *Identity Theft and Your Social Security Number*, United States Social Security Administration (July 2021), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf  (last accessed March 23, 2023).

[8] *Id.*

[9] Paul Nadrag, Capsule Technologies*, Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web*, Fierce Healthcare (January 26, 2021), available at: https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web (last accessed March 23, 2023).

[10] *Id.*

can wreak havoc and perpetuate far serious crimes such as drug dealing (by obtaining prescriptions under the victims' names) and major fraud (by filing large-scale and bogus insurance claims).[11]

51.     The wrongful use of compromised medical information is known as medical identity theft and the damage resulting from medical identity theft is routinely far more serious than the harm resulting from the theft of simple PII. Victims of medical identity theft spend an average of $13,500 to resolve problems arising from medical identity theft and there are currently no laws limiting a consumer's liability for fraudulent medical debt (by contrast, a consumer's liability for fraudulent credit card charges is capped at $50).[12] It is also "considerably harder" to reverse the damage from medical identity theft with victims routinely suffering long term harassment from aggressive medical debt collection practices, irreversible damage to credit, and even prosecution after thieves used their stolen data to stockpile prescription drugs for sale in the drug trade.[13]

52.     Instances of medical identity theft have grown exponentially over the years from approximately 6,800 cases in 2017 to just shy of 43,000 in 2021, which represents a seven-fold increase in the crime.[14]

53.     As explained by Kunal Rupani, director of product management at Accellion, a private cloud solutions company, in the context of a different medical data breach:

> Unlike credit card numbers and other financial data, healthcare information doesn't have an expiration date. As a result, a patient's records can sell on the black market

---

[11] *Id.*

[12] Medical Identity Theft, AARP (March 25, 2022), available at: https://www.aarp.org/money/scams-fraud/info-2019/medical-identity-theft.html (last accessed March 23, 2023).

[13] *Id.*

[14] *Id.*

for upwards of fifty times the amount of their credit card number, making hospitals and other healthcare organizations extremely lucrative targets for cybercriminals.[15]

54. In light of the dozens of high-profile health and medical information data breaches that have been reported in recent years, entities such as Defendants who are charged with maintaining and securing patient PII know the importance of protecting that information from unauthorized disclosure. Indeed, Defendants were aware of highly publicized security breaches where PII and protected health information was accessed by unauthorized cybercriminals, including breaches of computer systems involving Premera Blue Cross (as alleged above), UnityPoint Health, Lifetime Healthcare, Inc., Community Health Systems, Kalispell Regional Healthcare, Anthem, and many others.[16]

55. In addition, the Federal Trade Commission ("FTC") has brought dozens of cases against companies that have engaged in unfair or deceptive practices involving inadequate protection of consumers' personal data, including recent cases concerning health-related information against LabMD, Inc., SkyMed International, Inc., BetterHelp, and others. The FTC publicized these enforcement actions to place companies like Defendants on notice of their obligation to safeguard customer and patient information.

56. Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

---

[15] Jeff Goldman, 21st Century Oncology Notifies 2.2 Million Patients of Data Breach (Mar. 11, 2016), http://www.esecurityplanet.com/network-security/21st-century-oncology-notifies-2.2-million-patients-of-data-breach.html (last accessed March 11, 2023).

[16] See e.g., Healthcare Data Breach Statistics, HIPAA Journal, available at: https://www.hipaajournal.com/healthcare-data-breach-statistics (last accessed March 11, 2023).

57.     Given the nature of the Data Breach, as well as the long delay in notification to the Class Members, it is foreseeable that the compromised Private Information has been or will be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Plaintiff's and Class Members' Private Information can easily obtain tax returns or open fraudulent credit card accounts in Class Members' names or even attempt to obtain fraudulent home loans, as happened with Plaintiff.

58.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because credit card victims can cancel or close credit and debit card accounts.[17] The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

59.     Despite the prevalence of public announcements of data breach and data security compromises, their own acknowledgment of the risks posed by data breaches, and their own acknowledgment of its duties to keep Private Information private and secure such as set forth above, Defendants failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from misappropriation. As a result, the injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures.

---

[17] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, Forbes, Mar 25, 2020, available at https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last accessed March 11, 2023).

**E.    Defendants Had a Duty and Obligation to Protect Private Information**

60.    Defendants have an obligation, both statutory and self-imposed, to keep confidential and protect from unauthorized access and/or disclosure Plaintiff's and Class Members' Private Information. These obligations are derived from: 1) government regulations and state laws, including HIPAA and FTC rules and regulations and associated state laws; 2) industry standards; and 3) promises and representations regarding the handling of sensitive PII and medical records. Plaintiff and Class Members provided, and Defendants obtained, their information on the understanding that it would be protected and safeguarded from unauthorized access or disclosure.

61.    HIPAA requires, *inter alia*, that Covered Entities and Business Associates implement and maintain policies, procedures, systems and safeguards that ensure the confidentiality and integrity of consumer and patient PII and PHI, protect against any reasonably anticipated threats or hazards to the security or integrity of consumer and patient PII and PHI, regularly review access to data bases containing protected information, and procedures and systems to detect, contain, and correct any unauthorized access to protected information, and companies are strictly liable for such violations of law. *See* 45 CFR § 164.302, *et seq.*

62.    Additionally, HIPAA requires Covered Entities and Business Associates to provide notification to every affected individual following the impermissible use or disclosures of any protected health information. The individual notice must be provided to affected individuals without unreasonable delay and no later than 60 days following discovery of the breach. Further, for a breach involving more than 500 individuals, entities are required to provide notice in prominent media outlets. *See* 45 CFR § 164.400, *et seq.*

21

63. Defendants have an obligation to comply with HIPAA requirements concerning the protection of PII and protected health information and prompt and adequate notification of data breaches.

64. Additionally, FTC Health Breach Notification Rule obligates companies that suffered a data breach to provide notice to every individual affected by the data breach, as well as notifying the media and the FTC. *See* 16 CFR 318.1, *et seq.*

65. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[18] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[19]

66. The FTC has issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-marking.[20]

67. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and

---

[18] 17 C.F.R. § 248.201 (2013).

[19] *Id.*

[20] *Start With Security*, Federal Trade Commission (June 2015), available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

practices for business.[21] The guidelines note businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[22] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.23 Defendants failed to implement any of the foregoing, as evidenced by the length of the Data Breach, the fact that the Data Breach went undetected and not subject to notification for months, and the amount of data exfiltrated.

68.     Here, at all relevant times, Defendants were fully aware of their obligation to protect the Private Information of their members, including Plaintiff and members of the Class.

69.     Defendants had and continue to have a duty to exercise reasonable care in collecting, storing, and protecting the Private Information from the foreseeable risk of a data breach. The duty arises out of the special relationship that exists between Defendants, Plaintiff and Class Members. This duty included, *inter alia*, not engaging in the withholding of material information from Plaintiff, the Class Members, and the public relating to the nature and scope of the Data Breach; their failure to employ adequate data security measures; their continued maintenance and use of the Private Information belonging to Plaintiff and Class Members without

---

[21] *Protecting Personal Information: A Guide for Business*, Federal Trade Comm'n (October 2016), available at https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business.

[22] *Id.*

[23] *Id.*

having adequate data security measures in place; and such other conduct that helped facilitate the theft of that Private Information.

70.     Defendants' failure to follow the FTC Guidelines and to employ reasonable and appropriate measures to protect against unauthorized access to confidential data constitutes unfair acts or practices prohibited by Section 5 of the Federal Trade Commission Act, 14 U.S.C. § 45.

71.     Further, Defendants had a duty to promptly notify Plaintiff and the Class that their Private Information was accessed by unauthorized persons, which they did not do for almost four months after the Data Breach took place.

**F.      Defendants Violated HIPAA, FTC, state law and Industry Standard Data Protection Protocols**

72.     HIPAA obligates Covered Entities and Business Associates to adopt administrative, physical, and technology safeguards to ensure the confidentially, integrity, and security of consumer and patient PII and PHI.

73.     The FTC rules, regulations, and guidelines obligate businesses to protect PII and PHI, from unauthorized access or disclosure by unauthorized persons.

74.     At all relevant times, Defendants were fully aware of the obligation to protect the patient PII and PHI entrusted to them by Class Members.

75.     Defendants were also aware of the significant consequences resulting from their failure to protect Private Information for the hundreds of thousands of individuals who provided their PII and PHI to Defendants either directly or indirectly, and knew that this data, if exfiltrated, would gravely injure consumers, including Plaintiff and Class Members.

76.     Unfortunately, Defendants collectively failed to comply with HIPAA, FTC rules, regulations and guidelines, state law and industry standards concerning the protection and security

of Private Information. As evidenced by the scope and nature of the Data Breach, among its many

deficient practices, Defendants failed in, *inter alia*, the following respects:

      a.     Developing and employing adequate intrusion detection systems;

      b.     Engaging in regular reviews of audit logs and authentication records;

      c.     Developing and maintaining adequate data security systems to reduce the risk of data breaches and cyberattacks;

      d.     Ensuring the confidentiality and integrity of its customers' customers' PII and protected health and information and records that Defendants receive and maintain;

      e.     Protecting against any reasonably anticipated threats or hazards to the security or integrity of its customers' customers' Private Information;

      f.     Implementing policies and procedures to prevent, detect, contain, and correct security violations;

      g.     Developing adequate policies and procedures to regularly review records of system activity, such as audit logs, access reports, and security incident tracking reports;

      h.     Implementing technical policies, procedures and safeguards for electronically stored information concerning Private Information that permit access for only those persons or programs that have specifically been granted access; and

      i.     Other similar measures to protect the security and confidentiality of its customers' customers' Private Information.

77.     Had Defendants implemented the above-described data security protocols, policies, and/or procedures, the consequences of the Data Breach could have been avoided or greatly reduced. In addition, Plaintiff and Class Members would have been notified sooner, allowing them to promptly take protective and mitigating actions much earlier than by the time they received notice of the Data Breach.

**G.      Defendants' Data Security Practices are Inadequate and Inconsistent with its Self-Imposed Data Security Obligations**

78.      Plaintiff and Class Members provided their Private Information to Defendants either directly or indirectly based in part upon Defendants' assurances and self-imposed obligations to keep PII and medical information such as at issue here confidential, and to secure the Private Information from unauthorized access by the very "bad actors" referenced in the notice. It is difficult to imagine how, in our day and age of data and identity theft, the mandatory receipt of Social Security numbers, medical information or other sensitive Private Information would not imply the recipient's assent to sufficiently protect that information.  Yet Defendants failed to do so.

79.      Had Defendants undertaken the actions that federal and state law require, the Data Breach could have been prevented or the consequences of the Data Breach significantly reduced, to the detriment, injury and loss to Plaintiff and members of the Class.

**H.      Plaintiff and the Class Members Suffered Harm Resulting from the Data Breach**

80.      The Data Breach presents major problems for all affected.[24]

81.      The FTC warns the public to pay particular attention to how they keep personally identifying information including Social Security numbers and other sensitive data. As the FTC notes, "once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[25]

---

[24] Paige Schaffer, *Data Breaches' Impact on Consumers*, Insurance Thought Leadership (July 29, 2021), available at https://www.insurancethoughtleadership.com/cyber/data-breaches-impact-consumers (last accessed March 23, 2023).

[25] *Warning Signs of Identity Theft*, Federal Trade Comm'n, available at https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft (last accessed March 11, 2023).

82.     The ramifications of Defendants' failure to properly secure Plaintiff's and Class Members' Private Information are severe. Identity theft occurs when someone uses another person's financial and personal information, such as that person's name, address, Social Security number, and other information, without permission, in order to commit fraud or other crimes.

83.     According to data security experts, one out of every four data breach notification recipients become a victim of identity fraud.

84.     Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

85.     Accordingly, Defendants' wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff and the Class Members at an imminent, immediate, and continuing increased risk of identity theft and identity fraud.[26]   Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach."[27] Javelin Strategy & Research, a leading provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[28]   Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported.  Even data that has not yet been exploited by cybercriminals presents a concrete risk that the cybercriminals who now

---

[26] *Data Breach Victims More Likely To Suffer Identity Fraud*, INSURANCE INFORMATION INSTITUTE BLOG (February 23, 2012), available at http://www.iii.org/insuranceindustryblog/?p=267 (last accessed March 11, 2023).

[27] Susan Ladika, *Study: Data Breaches Pose A Greater Risk*, CREDITCARDS.COM (July 23, 2014), available at http://www.creditcards.com/credit-card-news/data-breach-id-theft-risk-increase-study-1282.php (last accessed March 11, 2023).

[28] THE CONSUMER DATA INSECURITY REPORT: EXAMINING THE DATA BREACH- IDENTITY FRAUD PARADIGM IN FOUR MAJOR METROPOLITAN AREAS, available at https://www.it.northwestern.edu/bin/docs/TheConsumerDataInsecurityReport_byNCL.pdf) (last accessed March 11, 2023).

possess Class Members' Private Information will use it or re-sell it at a later period – and more likely beyond the one year of credit monitoring and insurance protection provided by Defendants.

86.     The theft of medical information, beyond the theft of more traditional forms off PII, is especially harmful for victims. Medical identity theft, the misuse of stolen medical records and information, has seen a seven-fold increase over the last five years and this explosive growth far outstrips the increase in incidence of traditional identity theft.[29] Medical identity theft is especially problematic for victims because of the lack of laws that limit a victim's liabilities and damages from this type of identity theft (e.g., a victim's liability for fraudulent credit card charges is capped at $50), the unalterable nature of medical information, the sheer costs involved in resolving the fallout from a medical identity theft (victims spend, on average, $13,500 to resolve problems arising from this crime), and the risk of criminal prosecution.[30]

87.     Here, due to the Data Breach, Plaintiff and Class Members have been exposed to injuries that include, but are not limited to:

   a.      Theft of Private Information;

   b.      Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts as a direct and proximate result of the Private Information stolen during the Data Breach;

   c.      Damages arising from the inability to use accounts that may have been compromised during the Data Breach;

   d.      Costs associated with spending time to address and mitigate the actual and future consequences of the Data Breach, such as finding and challenging fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, placing freezes and alerts on their credit reports, contacting their financial institutions to notify them that their personal information was exposed and to dispute fraudulent charges, imposition of withdrawal and purchase limits on compromised

---

[29] Medical Identity Theft, AARP (March 25, 2022), available at: https://www.aarp.org/money/scams-fraud/info-2019/medical-identity-theft.html (last accessed March 23, 2023).

[30] *Id.*

accounts, including but not limited to lost productivity and opportunities, time taken from the enjoyment of one's life, the requirement to obtain replacement equipment, and the inconvenience, nuisance, and annoyance of dealing with all issues resulting from the Data Breach, if they were fortunate enough to learn of the Data Breach despite Defendants' failure in disseminating notice expeditiously in accordance with state law;

e.      The imminent and impending injury resulting from potential fraud and identity theft posed because their Private Information is exposed for theft and sale on the dark web; and

f.      The loss of Plaintiff's and Class Members' privacy.

88.     Plaintiff and Class Members have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their Private Information being accessed by cybercriminals, risks that will not abate within a year.  The unauthorized access of Plaintiff's and Class Members' Private Information, especially their Social Security numbers, puts Plaintiff and the Class Members at risk of identity theft indefinitely.

89.     As a direct and proximate result of Defendants' acts and omissions in failing to protect and secure Private Information, Plaintiff and Class Members have been placed at a substantial risk of harm in the form of identity theft and have incurred and will incur actual damages in an attempt to prevent identity theft.

90.     While Plaintiff and Class Members are now aware of the vulnerabilities in Defendants' current data security protection systems, they would continue to use the services provided by Defendants as they have no realistic alternatives in terms of the provision of health care services to them.  Given Defendants' ongoing business acts and practices, Plaintiff has and retains a vested interest in ensuring Defendants modify their current data security practices so that there are no future breaches of their sensitive data and Private Information.  As a result, in addition to seeking a remedy for the harms Plaintiff has already suffered as a result of the Data Breach on

behalf of both herself and all similarly situated individuals whose Private Information was accessed in the Data Breach, Plaintiff has standing to seek injunctive relief.

## V. CLASS ALLEGATIONS

91. Plaintiff brings this action on behalf of herself and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a Class defined as:

> All persons in the United States whose Private Information were accessed in the Data Breach.

Excluded from the Class are Defendants, their executives and officers, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change or expand the Class definition after conducting discovery.

92. Numerosity: The Class is so numerous that joinder of all members is impracticable. The number of affected individuals is estimated to be 192,231 individuals alone in the BCBSIL data breach, and there are likely tens if not hundreds of thousands of additional impacted individuals when the related data breaches involving the other Defendants are combined. The exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process. The members of the Class will be identifiable through information and records in Defendants' possession, custody, or control.

93. Existence and Predominance of Common Questions of Fact and Law: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

> a. Whether Defendants' data security and retention policies were unreasonable;

b.  Whether Defendants failed to protect the confidential and highly sensitive information with which they were entrusted;

c.  Whether Defendants owed a duty to Plaintiff and Class members to safeguard their Private Information;

d.  Whether Defendants breached any legal duties in connection with the Data Breach;

e.  Whether Defendants' conduct was intentional, reckless, willful or negligent;

f.  Whether an implied contract was created concerning the security of Plaintiff's and Class members' Private Information or whether they are beneficiaries of contracts between Defendants;

g.  Whether Defendants breached that implied contract by failing to protect and keep secure Plaintiff's and Class Members' Private Information and/or failing to timely and adequately notify Plaintiff and Class Members of the Data Breach;

h.  Whether Plaintiff and Class Members suffered damages as a result of Defendants' conduct; and

i.  Whether Plaintiff and the Class are entitled to monetary damages, injunctive relief and/or other remedies and, if so, the nature of any such relief.

94.  <u>Typicality</u>: All of Plaintiff's claims are typical of the claims of the Class since Plaintiff and all members of the Class had their Private Information compromised in the Data Breach. Plaintiff and the members of the Class sustained similar damages as a result of Defendants' uniform wrongful conduct.

95.  <u>Adequacy</u>: Plaintiff is an adequate class representative because her interests do not materially or irreconcilably conflict with the interests of the Class she seeks to represent, she has retained counsel competent and highly experienced in complex class action litigation, and she intends to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the Class. Neither Plaintiff nor her counsel have any interests that are materially antagonistic or irreconcilably conflict with the interests of other members of the Class.

96.     Superiority: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

97.     Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final relief with respect to the Class as a whole.

## VI.     CAUSES OF ACTION

### COUNT I – Negligence

98.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

99.     This count is brought on behalf of all Class Members.

100.    Defendants owed a duty to Plaintiff and the Class to use and exercise reasonable and due care in obtaining, protecting, retaining, and securing the Private Information that Defendants collected. Defendants also have a duty to maintain reasonable security measures under the Illinois Personal Information Protection Act ("IPIPA"), 815 ILCS § 530/20.

101.    Defendants owed a duty to Plaintiff and the Class to provide security, consistent with industry standards and requirements, and to ensure that its cyber networks and systems, and

32

the personnel, contractors and vendors responsible for them, adequately protected the Private Information that was collected by Defendants.

102.    Defendants owed a duty to Plaintiff and the Class to implement processes to quickly detect a data breach, to timely act on warnings about data breaches, and to inform the victims of a data breach as soon as possible after it is discovered.

103.    Defendants owed a duty of care to Plaintiff and the Class because they were a foreseeable and probable victim of any inadequate data security practices.

104.    It was reasonably foreseeable that a failure of Defendants to maintain reasonable security measures would allow unauthorized third parties to gain access to stored personal information such as the Private Information at issue, and it is likely that a data breach of this information would cause injury to the individuals that the personal information belongs to, *i,e.*, Plaintiff and members of the Class. Additionally, Defendants are sophisticated companies that are well aware of the risks of providing inadequate security measures for personal information. Providing reasonable security measures for the storage of personal information is not a large burden for Defendants, given they are required by law to do so. Plaintiff's tort claims are based on Defendants' common law duty to safeguard personal information rather than based solely on any express contractual duty.

105.    Defendants gathered and stored the Private Information belonging to Plaintiff and the Class.

106.    Defendants knew or should have known they inadequately safeguarded this information.

107.    Defendants knew or should have known that a breach of this protected information would inflict millions of dollars of damages upon Plaintiff and Class Members, and thus were charged with a duty to adequately protect this critically sensitive information.

108.    Defendants had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' highly sensitive Private Information was entrusted to Defendants on the understanding that adequate security precautions would be taken to protect their PII and PHI.

109.    Defendants' own conduct also created a foreseeable risk of harm to Plaintiff and Class Members. This misconduct included failing to: (1) secure their systems, servers and networks, despite knowing their vulnerabilities and ensured their contractors and vendors did so, (2) comply with industry standard security practices, (3) implement adequate system and event monitoring, and (4) implement the safeguards, policies, and procedures necessary to prevent this type of data breach.

110.    Defendants breached their duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate data security practices to safeguard the Private Information belonging to Plaintiff and the Class members, as evidenced by the Data Breach.

111.    Defendants breached the duties they owed to Plaintiff and Class Members by failing to implement proper technical systems or security practices that could have prevented the unauthorized access of the Private Information at issue here.

112.    The law further imposes an affirmative duty on Defendants to timely disclose the unauthorized access and theft of the Private Information belonging to Plaintiff and the Class Members so that they could take appropriate measures to mitigate damages, protect against adverse consequences, and potentially thwart future misuse of their Private Information. Defendants breached the duties they owed to Plaintiff and the Class Members by failing to timely and

accurately disclose to Plaintiff and Class Members that their Private Information had been improperly acquired or accessed.

113.    Defendants also breached their duty to expeditiously notify Plaintiff and Class Members of the Data Breach.

114.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class Members have suffered injury and damages as set forth above, including a drastically increased risk of identity theft, relative to both the time period before the Data Breach, as well as to the risk born by the general public, as well as other damages, including but not limited to time and expenses incurred in mitigating the effects of the Data Breach.

115.    As a direct and proximate result of Defendants' negligent conduct, Plaintiff and the Class Members and are entitled to damages in an amount to be proven at trial.

## COUNT II – Negligence Per Se

116.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

117.    This count is brought on behalf of all Class Members.

118.    HIPAA obligates Covered Entities and Business Associates such as the Defendants to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information" and "must reasonably safeguard protected health information." 45 C.F.R. § 164.530(c).

119.    In the event of a data breach, HIPAA obligates Covered Entities and Business Associates to notify affected individuals, prominent media outlets, and the Secretary of the Department of Health and Human Services of the data breach without unreasonable delay and in no event later than 60 days after discovery of the data breach. 45 C.F.R. § 164.400, *et seq.*

120.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC and referenced in various FTC publications and Orders, the unfair act or practice by companies such as Defendants of failing to use reasonable measures to protect PII..

121.    Defendants violated HIPAA and FTC rules and regulations obligating companies to use reasonable measures to protect Private Information by failing to comply with applicable industry standards and by failing to provide reasonable notice of the Data Breach. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored, the foreseeable consequences of a Data Breach and the exposure of Plaintiff's and Class Members' sensitive Private Information.

122.    As set forth herein, Defendants also violated the Illinois Personal Information Protection Act ("IPIPA"), 815 ILCS § 530/20, under which there is strict liability.

123.    Defendants' violations of HIPAA, Section 5 of the FTC Act, IPIPA, and other applicable statutes, rules, and regulations constitutes negligence *per se*.

124.    Plaintiff and Class Members are within the category of persons HIPAA, the FTC Act, IPIPA and other applicable statutes, rules, and regulations were intended to protect.

125.    The harm that occurred to Plaintiff and Class Members as a result of the Data Breach described herein is the type of harm HIPAA, FTC Act, IPIPA and other applicable statutes, rules, and regulations were intended to guard against.

126.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and Class Members have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their Private Information, and are entitled to damages in an amount to be proven at trial.

### COUNT III – Breach of Third-Party Beneficiary Contract And Implied Contract

127.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

128.    This count is brought on behalf of all Class Members.

129.    Plaintiff does not allege an express contract between the parties that would establish a duty by Defendants to safeguard Plaintiff's and Class Members' Private Information.  Rather, Defendants BCBS IL entered into contracts with its contractors or vendors, including HCSC and THC, to provide services to both it and its members. The terms of these contracts included material descriptions of required data security practices, procedures, and protocols sufficient to safeguard Private Information that its members would entrust to BCBS IL. The other Blues entities identified herein entered into similar contracts with HCSC and THC.

130.    Such contracts were made expressly for the benefit of Plaintiff and the Class Members, as it was their Private Information that Defendants agreed to receive and protect through such services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiff the Class Members was the direct and primary objective of the contracting parties and Plaintiff and Class Members were direct and express beneficiaries of such contracts.

131.    Defendants either knew or reasonably should have known that Plaintiff and the Class Members would suffer substantial harm in the event they breached these contracts.

132.    In addition, a contract in fact between Class Members and Defendants can be implied from the facts and circumstances that demonstrate the parties' intent to be bound, and an implied-in-fact contract is created through the actions and conduct of the parties as detailed herein. Defendants made representations in their privacy policies that they would safeguard Plaintiff's and Class member's personal information using reasonable security measures. Further, it is implied from the relationship between the parties that Defendants would take reasonable steps to ensure

37

that Plaintiff's and Class Member's Private Information would be protected from unauthorized disclosure. The facts and circumstances between the parties as set forth herein were sufficient to imply a contract between them for the security of Plaintiff's and Class Members' Private Information.

133. Through the various actions and inactions described above, Defendants breached such contracts.

134. The Data Breach caused Plaintiff and Class Members to be harmed through, *inter alia*, suffering the actual economic and monetary damages and injuries as set forth above. .

135. Accordingly, Plaintiff and the Class Members are entitled to damages in an amount to be determined at trial.

## **COUNT IV – Unjust Enrichment**

136. Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

137. This count is brought on behalf of all Class Members.

138. Plaintiff and the Class Members have an interest, both equitable and legal, in their Private Information that was collected and maintained by Defendants.

139. Defendants were benefitted by the conferral upon them of Plaintiff's and Class Members' Private Information and by their ability to retain and use that information. Defendants understood that they were in fact so benefitted.

140. Defendants also understood and appreciated that Plaintiff's and Class Members' Private Information was private and confidential and its value depended upon Defendants maintaining the privacy and confidentiality of that information, and expending resources to protect the sanctity and security of that data. Defendants thus appreciated financial benefits by not expending the necessary resources to protect such Private Information of Plaintiff and Class

Members as well as monies paid to Defendants either directly by Plaintiff and Class Members or for their benefit, and unjustly retained such benefits to Plaintiff and Class members' detriment.

141.     As a result of Defendants' wrongful conduct as alleged herein, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the Class Members. Defendants have unjustly retained a benefit, and Defendants' retention of that benefit violates fundamental principles of justice, equity, and good conscience.

This unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

142.     Under the doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain the benefits they received, and are still receiving, without justification, from Plaintiff and the Class members in an unfair and unconscionable manner. The retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

143.     The benefits conferred upon, received, and enjoyed by Defendants were not conferred officiously or gratuitously, and it would be inequitable and unjust for Defendants to retain such benefits.

144.     Plaintiff has no adequate remedy at law.

145.     Defendants are therefore liable to Plaintiff and the Class members for restitutionary damages in the amount of the benefit conferred on Defendants as a result of this wrongful conduct, including for example the value to Defendants from monies saved from not having in place adequate safeguards for protection of the Private Information that was accessed and exfiltrated in the Data Breach.

## COUNT V – Invasion of Privacy

146.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

147.     This count is brought on behalf of all Class Members.

148.     Plaintiff and Class Members had a reasonable expectation of privacy in the Private Information that Defendants possessed and/or continues to possess. It appears the Data Breach included Plaintiff's and Class Members' benefit enrollment information, which could contain private facts about Plaintiff and Class Members such as their financial history, medical history, and beneficiary information.

149.     By failing to keep Plaintiff's and Class Members' Private Information safe, Defendants invaded and/or permitted the invasion of Plaintiff's and Class Members' privacy by:

      a.     Intruding into their private affairs in a manner that would be highly offensive to a reasonable person; and

      b.     Publicizing private facts about Plaintiff and Class Members, which is highly offensive to a reasonable person.

150.     Defendants knew, or acted with a negligent or reckless disregard of the fact that, a reasonable person in Plaintiff's and Class Members' position would consider their actions highly offensive.

151.     Defendants permitted the invasion of and/or invaded Plaintiff's and Class Members' right to privacy and intruded into Plaintiff's and Class Members' private affairs by mishandling, misusing and/or permitting the disclosure of their Private Information without their informed, voluntary, affirmative, and clear consent.

152.     As a proximate result of such misuse, both Plaintiff's and Class Members' reasonable expectation of privacy in their Private Information was unduly frustrated and thwarted. Defendants' conduct amounted to a serious invasion of Plaintiff's and Class Members' protected privacy interests.

153.    In failing to protect Plaintiff's and Class Members' Private Information, and in misusing and/or disclosing their Private Information, Defendants acted with malice and oppression and in conscious disregard of Plaintiff's and Class Members' rights to have such information kept confidential and private, in failing to provide adequate notice, and in placing their own economic, corporate, and legal interests above the privacy interests of hundreds of thousands of individuals. Plaintiff, therefore, seeks an award of damages, including punitive damages, on behalf of Plaintiff and Class Members.

### COUNT IV – Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, et seq.

154.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

155.    This count is brought on behalf of all Class Members.

156.    The IPIPA provides that a violation of that statute constitutes a *per se* unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, et seq. ("ICFA"), which prohibits unfair and deceptive acts or practices in the conduct of trade and commerce.

157.    Defendants fall within the definition of a "data collector" under IPIPA.  As a data collector, Defendants own or license information concerning Plaintiff and Class Members.

158.    The IPIPA requires a data collector that "maintains or stores … records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, … use, … or disclosure." IPIPA, 815 ILCS § 530/45(a).

159.    The IPIPA further requires that entities such as Defendants "notify the resident at no charge that there has been a breach of the security of the system data following discovery or notification of the breach.  The disclosure notification shall be made in the most expedient time

41

possible and without reasonable delay, consistent with any measures necessary to determine the scope of the breach and restore the reasonable integrity, security, and confidentiality of the data system." IPIPA, 815 ILCS § 530/10(a).

160.    As alleged in detail above, Defendants violated the IPIPA by failing to implement and maintain reasonable security measures to protect Plaintiff's and Class Members' Personal Information.  Defendants further violated the IPIPA by failing to give Plaintiff and the Class Members expedient notice of the Data Breach without unreasonable delay.

161.    Defendants thus engaged in a deceptive act or practice in the course of conduct involving trade or commerce, and it was Defendants' intent to rely on that deception. As a result of the acts set forth above, such deception actually occurred.

162.    As a direct and proximate result of Defendants' failures, Plaintiff and the Class Members have suffered actual economic damage and losses.  For Plaintiff, this includes experiencing fraudulent credit card charges, the requirement to obtain a new phone, and the other losses set forth above.

163.    Plaintiff, on behalf of herself and members of the Class Member, seeks compensatory damages for breach of the IPIPA and the ICFA, which includes the cost of future monitoring of their credit history for identity theft and fraud, plus attorneys' fees, prejudgment interest, and costs.

### COUNT VI – Declaratory Judgment and Injunctive Relief

164.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

165.    This count is brought on behalf of all Class Members.

166.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant

further necessary relief. The Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described herein.

167.    An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class Members' Private Information, and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their Private Information.

168.    Plaintiff and the Class Members continue to suffer injury as a result of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

169.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Defendants continue to owe a legal duty to secure Plaintiff's and Class Members' Private Information, to timely notify them of any data breach, and to establish and implement data security measures that are adequate to secure their Private Information.

170.    The Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect Plaintiff's and Class Members' Private Information. Issuance of the requested injunction will serve the public interest.

171.    If an injunction is not issued, Plaintiff and the Class Members will suffer irreparable injury, as they otherwise lack an adequate legal remedy.

172.    The hardship to Plaintiff and the Class Members if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another data breach occurs within Defendants' operations now that they have been shown to be vulnerable,

Plaintiff and the Class Members will likely be subjected to substantial identify theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures. Doing so would also potentially eliminate additional injuries to Plaintiff and the hundreds of thousands of Class Members whose confidential information would be further compromised.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually, and on behalf of all members of the Class, respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, as follows:

A.   That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's Counsel as Class Counsel;

B.   That Plaintiff be granted the declaratory relief sought herein;

C.   That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

D.   That the Court award Plaintiff and the Class Members compensatory, consequential, and general damages in an amount to be determined at trial;

E.   That the Court award Plaintiff and the Class Members statutory damages, punitive or exemplary damages, to the extent permitted by law;

F.   That the Court award Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

G.   That the Court award Plaintiff and the Class Members pre- and post-judgment interest at the maximum legal rate;

H.   That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

I.   That the Court grant all other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the members of the Class, demand a trial by jury on all issues so triable.

Date: November 10, 2023          Respectfully Submitted,

MEYERS & FLOWERS, LLC

_____

Peter J. Flowers
Matthew Herman
**MEYERS & FLOWERS, LLC**
3 N. 2nd Street, Suite 300
St. Charles, IL 60174
pjf@meyers-flowers.com
mh@meyers-flowers.com
(630) 232-6333 Voice
(630-845-8982 Facsimile

Joe R. Whatley, Jr.
Edith M. Kallas *(Pro Hac Vice Forthcoming)*
**WHATLEY KALLAS, LLP**
152 West 57th Street, 41st Floor
New York, NY 10019
jwhatley@whatleykallas.com
ekallas@whatleykallas.com
(212) 447-7060 Voice
(800) 922-4851 Facsimile

Patrick J. Sheehan
**WHATLEY KALLAS, LLP**
101 Federal Street, 19th Floor
Boston, MA 02110
psheehan@whatleykallas.com
(617) 203-8459 Voice
(800) 922-4851 Facsimile

Alan M. Mansfield *(Pro Hac Vice Forthcoming)*
(Of Counsel)
**WHATLEY KALLAS, LLP**
16970 W. Bernardo Dr., Suite 400
San Diego, CA 92127
amansfield@whatleykallas.com
(858) 674-6641 Voice
(855) 274-1888 Facsimile

**ATTORNEYS FOR PLAINTIFF AND THE PROPOSED CLASS**

45